IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

DARIUS BRADDY,
      Petitioner,

v.                          Case No.: 4:17cv478/RH/EMT

MARK S. INCH,[1]
      Respondent.

_____

## ORDER, REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1). Respondent filed an answer and relevant portions of the state court record (ECF No. 12). Petitioner filed a reply (ECF No. 18).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to federal habeas relief.

---

[1] Mark S. Inch succeeded Julie L. Jones as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d).

## I.    BACKGROUND & PROCEDURAL HISTORY

The procedural background of this case is established by the state court record (ECF No. 12).[2]  On January 13, 2011, Petitioner was charged with attempted first-degree murder with actual possession and discharge of a firearm causing great bodily harm to Vincent Cuavers in violation of Fla. Stat. §§ 777.04(4)(b) and 782.04(1)(a)1 (Ex. A at 10).  In February of 2012, Petitioner was tried before a jury in the Circuit Court in and for Leon County, Florida, Case No. 2010-CF-3569 (Ex. C).  The jury returned a verdict of guilty of the lesser offense of attempted second-degree murder with actual possession and discharge of a firearm inflicting great bodily harm (Ex. A at 96–98; Ex. C at 435–36).  The court sentenced Petitioner to a minimum mandatory term of twenty (20) years in prison (Ex. A at 118–27; Ex. D at 145–59).  Petitioner appealed the judgment and sentence to the Florida First District Court of Appeal ("First DCA"), Case No. ID12-3244 (*see* Exs. E, F & G).  On October 22, 2013, the First DCA affirmed per curiam without a written opinion (Ex. I).  *Braddy v. State*, 125 So. 3d 155 (Fla. 1st DCA 2013).  Mandate issued December 12, 2013 (Ex. L).  No further review was sought.

---

[2] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's answer (ECF No. 12) unless otherwise indicated.  Additionally, if a page has more than one page number, the court cites to the "Bates stamp" page number.

On February 23, 2015, Petitioner filed a motion for post-conviction relief pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure, by and through counsel Mark V. Murray, in which he raised five claims of ineffective assistance of counsel (Ex. M). On March 2, 2015, Petitioner filed an amended motion, again raising five claims of ineffective assistance of counsel (Ex. N). An evidentiary hearing was held on April 5, 2016 (Ex. N at 41–116). At the outset of the hearing, Petitioner's post-conviction counsel stated that the defense would not be pursuing Ground Two of the amended motion and would not present any witnesses (*see* Ex. N at 43, 53). On May 13, 2016, the circuit court denied Petitioner's amended motion (Ex. N at 34–36). Petitioner appealed the denial of post-conviction relief to the First DCA challenging the denial of Grounds One, Three, and Four (Ex. O). After briefing by the parties, the First DCA per curiam affirmed without written opinion (Ex. R). Mandate issued October 19, 2017 (Ex. S). *Braddy v. State*, 235 So. 3d 814 (Fla. 1st DCA 2017).

Petitioner filed his timely petition for a writ of habeas corpus in this court on October 20**,** 2017. The petition is now ripe for adjudication.

## II.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254. Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254(d) provides, in relevant part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue presented in a federal habeas

petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *See Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court holdings. *Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision

contradicts them."). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's holdings. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on an unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as

unreasonable merely because we would have reached a different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See Cave v. Sec'y for Dep't of Corr.*, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." *Gill*, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue

unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

## III.    PETITIONER'S CLAIMS

Ground One: Ineffective Assistance of Counsel For Failing to Object to Improper Closing Arguments

In his first ground for relief, Petitioner alleges that his defense counsel was ineffective in failing to object to numerous improper arguments the prosecutor made in her rebuttal closing argument. Specifically, Petitioner alleges that "[t]he prosecutor made arguments that mischaracterized the facts presented at trial, shifted the burden of proof, and commented on the Petitioner's right to remain silent" (ECF No. 1 at 9). While Petitioner stated in his petition that this ground would be expanded upon in a supporting memorandum of law, no memorandum was filed. However, Petitioner addresses each alleged improper argument in his reply and argues that individually and cumulatively the effect of these arguments rendered his trial fundamentally unfair (*see* ECF No. 18 at 8–24).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set

forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To obtain relief under *Strickland*, Petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms. *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also

constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence

in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding.  *Id.* (citation omitted).  And Petitioner must show that the likelihood of a different result is substantial, not just conceivable.  *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112).  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Strickland*, 466 U.S. at 695.  The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law.  *Id.* at 694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), *Strickland* prejudice is gauged against the outcome of the trial, not on appeal.  *See Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting *Strickland*'s high bar

is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176

L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland* was

unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788. As

the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly
> deferential," and when the two apply in tandem, review is "doubly" so.
> The *Strickland* standard is a general one, so the range of reasonable
> applications is substantial. Federal habeas courts must guard against the
> danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question
> is not whether counsel's actions were reasonable. The question is
> whether there is any reasonable argument that counsel satisfied
> *Strickland*'s deferential standard.

*Id.* (citations omitted).

    2.    Federal Review of State Court Decision (as to Sub-claim One of Ground
One—Prosecutorial Comments on Facts Not in Evidence)

Petitioner raised this claim in Ground Four of his amended Rule 3.850 motion.

The post-conviction court denied relief, and the First DCA per curiam affirmed the

denial (as previously noted, without opinion). The state circuit court adjudicated the

claim as follows:

> Ground 4 faults trial counsel for failing to object to improper closing
> arguments made by Courtney Frazier, Assistant State Attorney. In
> Ground 4(a) Defendant alleges that [defense counsel] Mr. Srygley should

> have objected to Ms. Frazier's comments on what he considers to be facts
> not in evidence.  A close reading of the examples used showed that Ms.
> Frazier's comments could reasonably be considered fair comments on the
> evidence presented during the trial.

(Ex. N at 35).  The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id.*).  Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.  In *Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188 (2018), the Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption.  The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained
> decision to the last related state-court decision that does provide a
> relevant rationale.  It should then presume that the unexplained decision
> adopted the same reasoning.  But the State may rebut the presumption by
> showing that the unexplained affirmance relied or most likely did rely on
> different grounds than the lower state court's decision, such as alternative
> grounds for affirmance that were briefed or argued to the state supreme
> court or obvious in the record it reviewed.

*Id.* at 1192.  Respondent argues that the state court determination was correct and that the record supports the determination.

A brief summary of the facts of the case are summarized in Petitioner's initial

brief on appeal, in part, as follows[3]:

> Vincent Cuavers was a regular customer of Mr. Braddy, known to him
> as "Colt," and was in the custom of purchasing thirty dollars worth of
> marijuana from Mr. Braddy at least twice a month.  On October 28, 2010,
> during Florida A & M University's homecoming week, Mr. Cuavers
> called Mr. Braddy in order to arrange a purchase of marijuana.
> Arrangements were made for a meeting at the Casa Cordoba Apartments,
> and Mr. Braddy directed Mr. Cuavers to a location to park in the parking
> lot of the apartments.
>
> Mr. Braddy entered the passenger side of Mr. Cuavers's car, and showed
> Mr. Cuavers a portion of marijuana that was less than what Mr. Cuavers
> normally purchased.   After Mr. Cuavers indicated he wanted more
> marijuana, Mr. Braddy got out of the car, walked away, then returned and
> got back into the car.  According to Mr. Cuavers, Mr. Braddy pulled out
> a handgun and cocked it, then Mr. Cuavers pushed the gun or Mr.
> Braddy's hand and opened the driver's door and ran.  As Mr. Cuavers
> ran, he heard shots and bullets flying by, one of which hit him in the
> elbow. Mr. Cuavers ran out of his flip-flop shoes, and left behind a hat,
> cellphone, and wallet.   Mr. Cuavers identified his flip-flops and hat
> which were introduced as State's Exhibits 1-3, and testified that his
> cellphone and wallet were returned to him by the Tallahassee Police
> Department.  Mr. Cuavers last saw Mr. Braddy seated in the passenger
> seat of his car, and did not see Mr. Braddy get out of the car.  As he was
> running, Mr. Cuavers did not see anyone else in the area, or anyone else
> with a gun.  Mr. Cuavers displayed the injury to his elbow to the jury and
> testified regarding the surgery performed on his elbow.

(Ex. E at 3–4) (citations to the record omitted).   Petitioner's defense at trial was that

---

[3] In its answer brief, the State accepted this statement of facts as being generally supported by the record, with a few corrections not material to the facts recited here (*see* Ex. F at 2).

someone else shot the victim.    The defense called one trial witness and Petitioner did not testify, although statements he made during a custodial interview with law enforcement were presented to the jury through the testimony of those officers.

   a.    "*Braddy Shot at Cuavers from Outside of the Car*"

At trial, the defense advanced the theory that Petitioner did not shoot the victim, but that shots were fired by two other shooters, including Petitioner's cousin, Phil, and an unidentified person hiding in nearby bushes.  Petitioner argues that comments made by the prosecutor in her rebuttal closing argument advanced a theory of guilt with no support in the record (ECF No. 18 at 11–12).  Petitioner argues that at trial Mr. Cuavers testified that when Petitioner, who was in the passenger seat of the car, pulled out a gun, Mr. Cuavers jumped out of the car and ran away.  Mr. Cuavers claimed that he "immediately" heard gunshots; however, he also testified that the last time he saw Petitioner, he was seated in the car.  Petitioner also argues that forensic testing presented at trial ruled out the possibility that the gun had been discharged inside the victim's car.  In addition, he states that shell casings recovered at the scene were located seven to nine feet away from the rear of the car on the driver's side. Therefore, he does not believe the evidence presented at trial supports an inference that he jumped out of the car and then was able to fire those shots immediately from the

area where the shell casings were found.  Petitioner alleges that  his counsel's failure

to object to the prosecutor's argument was deficient performance.

At trial, Mr. Cuavers testified that when he met Petitioner on the night of the

shooting, Petitioner did not have the amount of marijuana that he usually purchased

(Ex. C at 44).  He testified that Petitioner got out of his car, walked down by the

apartments, and then got back in Mr. Cuavers' car.  Mr. Cuavers stated that Petitioner

did not say anything when he returned to the car, he just pulled out a gun and cocked

it.  The testimony continued as follows:

> Q.  [Assistant State Attorney Ms. Frazier]:  And what did he do when he
> pulled it out?
> A.  [Mr. Cuavers]: He like held it like this and cocked it.  I guess getting
> it ready, I suppose.
> Q.  And what was your—did he say anything to you when he did it?
> A.  No.
> Q.  What was your reaction?
> A.  I was like, no, man.  And I pushed the gun or his hand with the gun.
> And I opened the door on the driver's side and I ran.
>
> * * *
>
> Q.  So you just told us that you were running.  You got out of the car and
> you started to run.  Tell us what you saw or heard while that was going
> on.
> A.  When I opened the door and started running, I just hear like shots
> coming from the direction of where my car was.  I'm running up, out of
> the apartment complex, and I just hear like bullets flying by, like
> whistling (Demonstrating.)  As I was running, like my arm was like this,
> because I was running, and one of them got me in my elbow.

Q.  We're going to talk about your injury in just a second.  But when you got out of the car, did you see anybody standing right there next to the driver's side door?

A.  No.

Q.  Did you see anybody else in the parking lot?

A.  No.

Q.  Did you see anybody else with a gun?

A.  No.

Q.  Did you, yourself, have a gun?

A.  No.

Q.  When he got back in the car, did he ever give you any cannabis?  Did you ever receive any cannabis?

A.  Uh-uh, no.

Q.  How many shots do you think you heard, or do you know?

A.  I don't know.

Q.  More than one?

A.  More than one, yes.

Q.  Did the bangs that were going off behind you, did they sound any different or were they all consistent?

A.  They all sound like they was coming from the same area and the same gun.

Q.  Now, when you got out of the car, did you take a moment to shut the car door behind you?

A.  No, no.

Q.  Sir?

A.  No.

Q.  Did the bullets—did the sound of the bullets or the bullets coming at you, did they sound like they were coming from next to you?

A.  They sounded like they were coming from behind me.

Q.  The area that you had just left Mr. Braddy?

A.  Yes.

Q.  They didn't sound like they were coming in front of you; did they?

A.  No.

Q.  How long after you jump out of the car and start running do you hear that first shot?

A.  Immediately.

(*Id.* at 45–48). On cross-examination, Mr. Cuavers testified that the last time he saw Petitioner, he was still seated in the passenger seat of his car, and he never saw Petitioner get out of the car or fire his gun (*id.* at 81).

In her closing argument at trial the prosecutor argued that the physical evidence was consistent with the victim's testimony, including blood spatter and gun shell casings recovered at the scene (*see* Ex. C at 373). The defense closing focused on the lack of evidence and inconsistencies in the evidence. For example, defense counsel argued:

> We spent a lot of time going over the interior of this car. There's no evidence, no evidence that Mr. Braddy ever discharged or, in other words, fired a handgun that night. Okay? None. If he did, there should have been some, and I mean any, evidence in that car to show it was fired. Because there certainly is no evidence, there's a lack of evidence, to show that Mr. Braddy, not only did he not fire a gun, there's no evidence he got out of the car and fired a gun.
>
> So I guess we have to assume, because that's all we have here, is assumptions, and this is another assumption that you could make to show innocence, that the gun, if fired by Mr. Braddy, again, nothing to support this as far as it being fired, to leave some mark. It would be something on the—there would lead in the headliner above the passenger side. There would be lead, as I think it was Ms. Blizzard who said—or maybe it was Ms. Flanagan. Excuse me. I forget which. But anyway, it was one of the two witnesses—and in the dashboard of the passenger side where Mr. Braddy, again, is sitting. But it's not there.
>
> Now—and there's no fingerprints. And there's no DNA. And there's nothing to show that the gun was fired at that point. Now, there is—the

only DNA evidence that I recall being linked to any specific person, was, in fact, linked to Mr. Braddy, and it's on the handle of the passenger door, which means he must have opened the door and gotten in the car. And I do not mean to be silly or facetious. I don't think that's against the law. But it does establish he was on the car, okay?

Now, if the lack of evidence of DNA and all these other things and gunshot residue, which of course they never performed, that could have—this goes back to the idea [the State] wouldn't let evidence get in the way.

(*Id*. at 401–03).  In her rebuttal closing argument, the prosecutor argued that the evidence was consistent with Petitioner getting out of the victim's car and firing the shots.  She elaborated as follows (the italicized comments are those to which Petitioner objects):

*I would submit to you, and I'll get to this, that there's nothing—and the State has never argued that [Mr. Braddy] fired that firearm from inside the vehicle.  And I would submit that the evidence is consistent with the fact that he actually left that vehicle and fired from the outside.*

\* \* \*

Now I would submit to you, and per Mr. Braddy's own admission to Investigator McCollum, when the victim gets out and starts running, he says he got out of that car.  Now, he says what happened when he got out of the car was different than what I'm going to say happened.  But he told her, I got out of the car.

*I would submit to you that he got out of that passenger-side door and he stood right in this general area and he fired that firearm down that lane towards Ocala Road towards where Mr. Cuavers was headed.*

And what do we know about firearms from Investigator Ryan? When you shoot a gun, it's going to come out at the 2:00 position. That's pretty consistent with 2:00. And if you turn a firearm not like this but like this, that we've seen people can do that, that may bring that a little closer to where we're at.

Now, we've got a couple casings here. And even further down this way, which you can't see in this photograph, we've got a live round and a projectile. And remember, we had some testimony that this area right here is at a slant. And a live round is going to weigh more than a casing. You'll have them back there. You can hold them. They're in an envelope. So it may roll further in that area. A projectile is going to weigh more than a casing. So it may roll further in that area and butt up against that car that was right there where those items were found.

And the casings, as Mr. Ryan said, when they hit the ground, everything is going to bounce in its own way. But everything is consistent with being in this area, which is consistent with Mr. Braddy getting out of that car, standing here, and shooting right down that lane.

* * *

So again, members of the jury, where those casings ended up are consistent with what the testimony in this case has been. They're consistent with some of the things Mr. Braddy himself said occurred in this case.

What those shell casings are not consistent with are where Mr. Braddy starts telling Investigator McCollum that my cousin Phil was there with me, undoubtedly had a .45, and was standing at the driver's side door when Mr. Cuavers exited. He shot twice, a certainty on Mr. Braddy's part. Where did the .45 shell casings go? Wouldn't they be right in that area?

Okay. Now he changes the story a little bit. There's a guy in the bushes. He was firing as well. Where are those shell casings? Everybody

> testified that they canvassed that area.  That's what they do.  That's what
> they're sent there to do, to look for evidence.  There were no other shell
> casings found.  And if you want to believe that there was this imaginary
> fourth person there, why would his shell casings, as Mr. Braddy said he
> was a "he," though he did never see him, why would they be in the
> middle of the road if he's in the bushes shooting?  Those shell casings
> came out of that gun, which was fired by Mr. Braddy.

(*Id.* at 418, 420–23).

At the post-conviction evidentiary hearing, Petitioner's trial attorney, Paul

Srygley, was called as a witness by the State.  He testified that at the time of Petitioner's

trial he had been practicing law for approximately thirty-two years, specializing in

criminal defense for approximately ten years (Ex. N at 54).  Mr. Srygley described his

relationship with Petitioner as follows:

> We had a very good relationship, I believe.  It was sometimes, quite
> honestly, difficult to get him to, not explain what happened, but to, I
> guess, understand sometimes the seriousness of the case.  And by that I
> don't mean to say he didn't understand he was charged with a very—case
> or charges, it was just that he was very adamant that what had happened
> had happened the way he said it did, which is what we argued at trial.
>
> I don't think he could see any other argument that the prosecution was
> probably going to make when we went to trial.  In fact, they did—in fact,
> he was the shooter, he was the bad guy, he was the one that pulled the
> trigger, notwithstanding the fact that there was no evidence to show that
> he had ever shot a gun and a gun was shot in the car.

(*Id*. at 55).  As to his strategy about raising objections during closing arguments, the

following testimony was elicited:

Q. [Assistant State Attorney Eddie Evans]: Okay. Now, if a lawyer is arguing what you don't believe to be facts in evidence, would you necessarily object at that point?

A. [Mr. Srygley]: Well, in my experience, what the concern—one of the problems is, I have, in fact, years ago, on a couple of things I would—I objected to the prosecutor saying, "As Mr. So and So said," you know, "Mr. So and So said the car was black." And I objected saying, "Your Honor, that was not the testimony." Then I've had judges, in front of the jury, say, "Mr. Srygley, that's the way I recall it." So the problem is the court, the judge will reinforce what the prosecutor, I believe, still to this day, was erroneous. Unfortunately, the judge, perhaps as another witness or as another advocate, not meaning to be, but the judge can become an advocate for the prosecution in that case, and that hurts the case; versus if they sustain the objection, that shoots the—you know, you don't know how a judge—and, plus, you know, I remember things, your client will remember things, sometimes the court hears it a different way, just like jurors hear it a different way. So you've got to be very careful not to call attention to a point by making an objection.

Sometimes, you know, as I said, I've run into jurors later at Walmart or Publix or someplace, and they'll say, you know, "I remember you were the attorney on that case. I don't know why you were arguing or something about, you know, the car being black, when, in fact, we all talked about it. You know, the testimony, it was brown." But, you know, whatever.

So, anyway, the point is you don't know and you don't want to call attention to something that the court or the—excuse me, the jury doesn't hear. And then at the same time, you know, you've go to be careful, because generally the courts—in my experience, the judges don't like people interrupting argument, so—

(*Id*. at 65–66). The testimony continued as follows:

Q. Okay. Now, do you often object during closing arguments?

Case No.: 4:17cv478/RH/EMT

A. I generally do not unless it's something really, really, really egregious, because as I said, I've gotten shot down, and I've seen other defense counsel get shot down.   I mean, well, I mean, I've even had courts, judges, not the prosecutor interrupt when I have said something and I am 100 percent absolutely, totally, without doubt sure the testimony is how I described it, and the judge said, "That's not the way I heard it, don't argue that.  Move on."

And so to some extent—and I've seen this happen with other attorneys, too, I'm a little gun-shy.  No disrespect to the courts or the judges generally, much less in this case.  But the worst thing you can do is have the judge become another advocate or at least telling the jury what they heard.  It's tough.

Q.  So if you would have heard anything you thought rose to the level of warranting—so improper to warrant an objection, you would have raised that?

A.  I probably—I would have raised it; but at the same time, you know, you still—I'm just being honest.  In my experience over 30-something years, you've got to be careful what you say—because—not so much that the judge is going to overrule you, but you don't want to call attention to something that sometimes jurors don't even hear.   At the same time you've got to protect your client's interests, and I realize and I know that, and that's my responsibility.  But it is a fine line you're walking as a case is moving along very quickly, and it's easy in hindsight to say what you might do differently.   But at the time you are just moving along and listening.  And as an attorney, you're writing down and you are trying to recall what people are saying so you can respond.

(*Id*. at 68–69).  On cross-examination by post-conviction counsel, Mr. Srygley was

asked if he agreed that even if a judge might be a little disagreeable about some of

these things, that does not relieve a defense counsel's obligation to object to something

significant. Counsel responded:

> I would tend to agree with you. In hindsight, things I certainly
> would—you can always say you would do something different. I'm sure
> you've had that experience too. But at the same time, you have to look
> at the flow of the case, what's going on, what kind of statement is made,
> how the jury—you can look at the jury and see how perhaps they are
> reacting. But to answer your question, I think you always have a
> professional responsibility to protect the record and your client and do
> the best you can do under the circumstances.

(*Id*. at 77).

Under Florida law, the standard for reviewing prosecutorial comments is the

following:

> Wide latitude is permitted in arguing to a jury. Logical inferences may be
> drawn, and counsel is allowed to advance all legitimate arguments. The
> control of comments is within the trial court's discretion, and an appellate
> court will not interfere unless an abuse of such discretion is shown. A
> new trial should be granted when it is "reasonably evident that the
> remarks might have influenced the jury to reach a more severe verdict of
> guilt than it would have otherwise done." Each case must be considered
> on its own merits, however, and within the circumstances surrounding
> the complained-of remarks.

*Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (quoting *Darden v. State*, 329 So. 2d

287, 289 (Fla. 1976)) (other citations omitted). However, the prosecutor may not

"'inflame the minds and passions of the jurors so that their verdict reflects an

emotional response to the crime or the defendant rather than the logical analysis of the

evidence in light of the applicable law.'" *Jones v. State*, 612 So. 2d 1370, 1374 (Fla.

1993) (quoting *Bertolotti v. State*, 476 So. 2d 130 (Fla. 1985)). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution.   A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).   But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper.  *Id*. at 1507. Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence.  *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; she may comment on the evidence and express the conclusions she contends the jury should draw from the evidence.  *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984). A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See White v. State*, 377 So. 2d 1149 (Fla. 1980). Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See Smiley v. State*, 395 So. 2d 235 (Fla. 1st DCA 1981).  A  proper

rebuttal argument is limited to a reply to what has been brought out in the defendant's closing argument. *Brown v. State*, 18 So.3d 1149, 1150 (Fla. 4th DCA 2009).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978).[4] "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair. *See United States v. Eyster*, 948 F. 2d 1196, 1206 (11th Cir. 1991) (citations omitted); *Brooks v. Kemp*, 762 F. 2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F. 2d 700 (11th Cir. 1987); *Dessaure v. State*, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant

---

[4] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting the case law of the former Fifth Circuit developed before October 1, 1981, as precedent in this Circuit).

receives a fair trial).

Here, the post-conviction court found that the prosecutor's comments in closing argument could reasonably be considered fair comments on the evidence presented during the trial. The record amply supports the conclusion that in her closing remarks the prosecutor was advancing the State's theory of the case based on the evidence presented at trial. In addition, the prosecutor's comments were an appropriate response to the defense counsel's arguments that there was no evidence that Petitioner shot at the victim while seated in the car. *See Walls v. State*, 926 So. 2d 1156, 1166 (Fla. 2006) ("a prosecutor's comments are not improper where they fall into the category of an 'invited response' by the preceding argument of defense counsel concerning the same subject."); *see also Sorey v. State*, 463 So. 2d 1225 (Fla. 3d DCA 1985) (rejecting ineffective assistance claim for failure to object to prosecutor's closing argument which constituted a fair response to defense counsel's comments). Upon review of the evidence adduced at trial and the entirety of the arguments of the prosecutor and defense counsel during closing arguments (Ex. C), the undersigned concludes—as did the state circuit court and the First DCA—that Petitioner failed to show that defense counsel's failure to object to the comments constituted deficient performance, or that there is a reasonable probability the outcome of trial would have

been different if counsel had objected.  As noted above, the First DCA affirmed the circuit court's denial of this claim without explanation.    Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this ground.

          b.    *"Braddy Falsely Reported His Gun Stolen Prior to the Shooting"*

Petitioner next argues that the prosecutor mischaracterized the evidence and engaged in pure speculation when she argued during closing that Petitioner planned the robbery of the victim at least three days in advance and made a false report of gun theft to the police to cover the existence of the .380 shells found at the crime scene. During the trial the defense insinuated that a man named Andre Johnson was a possible suspect in the crime.  Petitioner explains this theory as follows:

> The state's evidence at trial established that, three days before the shooting, the Petitioner reported to police that two guns were stolen from his car: a .380 Highpoint handgun and a shotgun (He was employed as a security guard at the time, and the guns were legitimately owned). Evidence ultimately established that a .380 Jiminez Arms handgun was the gun that discharged the shell casings recovered from the scene of the shooting.  This is **not** the same gun that Petitioner reported stolen. These are two entirely different firearms.  The .380 Jiminez Arms (the gun that discharged the shell casings at the scene) was recovered by police in a duffel bag that also contained a pay stub for a paycheck made

out to "Andre Johnson." That duffel bag was found in a bedroom of the apartment the Petitioner shared with his girlfriend. Cuavers' wallet was found on a mattress in that same bedroom. There was no indication that any of the Petitioner's personal belongings were located in that particular bedroom, and a witness testified at trial that she observed Andre Johnson at the Petitioner's apartment the day of the shooting. The Petitioner's obvious defense at trial was that someone else shot Cuavers. Logically, the jury could assume that this person was Andre Johnson.

(ECF No. 18 at 13–14) (emphasis in original) (citations to the record omitted).

In his closing argument defense counsel made the point that the gun used in the crime and Mr. Cuavers' possessions were found in or adjacent to a bag which contained a pay stub in the name of Andre Johnson (Ex. C at 400–01). Mr. Srygley argued:

There's other people that can be investigated in this case. There's other possible perpetrators, if not probable perpetrators, that needed to be investigated, needed to be looked into, needed to be talked to, needed to be interviewed, such as Mr. Andre Johnson, the mysterious Andre Johnson. And it just didn't happen. So in an effort to zealously investigate a case

and then suddenly not be impeded by the evidence that showed that other people may have possessed or discharged this gun, such as Mr. Johnson, or other people may have — or persons, [kno

wn ]
o      r
unkno
w n ,
could
h a v e
d o n e
t h i s ,
t h e y
settled
o       n
M  r .
Bradd
y.

(*Id.* at 412–13).   During her closing rebuttal argument the prosecutor made the following statement:

> Now, [Petitioner] told, and there's no dispute that he told LCSO [Leon County Sheriff's Office] a couple of days before that a firearm was stolen.  I don't think it's too far of a leap to think I'm going to go and I'm going to rob this guy.  And the story I'm going to use, in case anything happens, was my .380 got stolen earlier.  Now, Mr. Johnson's in my home and he has a .380.  So if the casings recovered at the scene are .380 and the gun I said that was stolen was a .380, I can say he stole it and he was the one that was shooting . . . .  Again, that's not too far of a logical leap.  But there is a very large leap to say that Mr. Johnson was the one firing that [Jiminez] Arms because of a paycheck stub.

(*Id.* at 424).

In  this  case  the  state  court  found  these  comments  "could  reasonably  be considered fair comments on the evidence presented during the trial" (Ex. N at 35).

The undersigned agrees. The prosecutor's comments were directed at Petitioner's theory that Mr. Johnson may have been the actual perpetrator of the crime. She was arguing the improbability of this theory and suggesting that Petitioner may have reported his gun stolen in order to implicate Mr. Johnson in this crime. However, even if the comments were objectionable, they were not such as to render Petitioner's trial fundamentally unfair. "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974)). Thus, even if the comment in this case was improper, it is not enough to obtain federal habeas relief unless it resulted in a denial of due process. These standards have not been met; thus, the requirements of *Strickland* have not been met and habeas relief is not warranted.

Furthermore, juries are presumed to follow jury instructions. *United States v. Calderon*, 127 F.3d 1314, 1334 (11th Cir. 1997). In this case, before closing arguments the judge specifically admonished the jury that "what the attorneys say is not evidence" (Ex. C at 371). Additionally, when explaining the rules for deliberation, the judge

instructed the jury, "[t]his case must be decided only upon the evidence that you heard from the testimony of the witnesses and have seen in the form of the exhibits in evidence and these instructions" (*id*. at 365). Even if the prosecutor's comment was improper, it is presumed that the jury understood that the prosecutor's argument was not evidence and that the case could only be decided upon the evidence. Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this ground.

> Ground One, Sub-claim Two: Ineffective Assistance of Counsel For Failing to Object to Improper Closing Arguments—Shifting and Improper Comment on Right to Remain Silent

Petitioner alleges that the prosecutor misled the jury as to the proper burden of proof and made comments which were fairly susceptible of being interpreted as a comment on Petitioner's right to remain silent (ECF No. 18 at 18–24). Specifically, Petitioner challenges the following comment the prosecutor made in her rebuttal closing: "[T]here was zero testimony on either the defense's side or the State's side about whose bedroom in that home was whose. Nobody said that where the gun was found with that wallet was not Mr. Braddy's room. It very well could have been."

(Ex. C at 424).  Petitioner alleges that his trial counsel was ineffective in failing to object to these comments.

The post-conviction court denied relief, and the First DCA per curiam affirmed the denial without opinion.  The state circuit court adjudicated the claim as follows:

> Under Ground 4(b) Defendant alleges that trial counsel should have objected to comments that shifted the burden of proof from the State to the Defendant.  Again, a fair reading of the comments could reasonably have been seen by trial counsel as a fair comment on the evidence, and the arguments made by the Defendant.  Attorneys often do not object during closing for strategic reasons if the comments are not damaging. Even if trial counsel should have objected, the failure does not warrant a new trial under the parameters set out in *Strickland*.

(Ex. N at 35).  The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id.*).  Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence.  Respondent argues that the state court determination was correct and that the record supports the determination.

1.    Clearly Established Federal Law

The law governing ineffective assistance of counsel claims is set forth *supra*.

2.    Federal Review of State Court Decision

In defense counsel's closing he argued the following:

Where was that gun found? Where was Mr. Cuavers' wallet found? Where was his ID found? Where was the magazine and bullets found? Where was an ID, or, excuse me, a pay stub from a gentleman named Andre Johnson found? They were found all in the same bag or adjacent to that same bag. Okay. You might ask and you may think, well, who is Andre Johnson. Who is this mysterious Andre Johnson.

Well, what we know from the evidence is Mr. Johnson is someone whose pay stub was found adjacent to what appears to be, the argument of the State, it's a gun that was used in the commission of this alleged crime. Okay. His pay stub is found with it, you know, and it's found in Mr. Braddy's apartment, but it was in another bedroom with this gun and with this stuff of Andre Johnson. Well, who is the mysterious Andre Johnson, okay, and how does he relate to Mr. Braddy and how does he relate to Phil, cousin Phil. And that's one reason I did call Ms. Kinder, because she did say, when she got to Mr. Braddy's residence on the morning of the 29th to see what was going on, she saw Mr. Johnson being arrested by the police.

Unfortunately, we don't know the result of that arrest or what it was about. We don't. We're all bound by the rules of evidence and what can be presented and what can't be. I would venture to say, though, and this goes back to my original point, it would have been nice, it would be more than nice, it would have been appropriate, it would have been the right thing, and it would have been something that—I kind of feel for you all, because you don't have the opportunity to know what Mr. Johnson might say if he was called here today, because the State, with the burden of proof, after the police having arrested Mr. Johnson, he's nowhere to be found. Yet his—the gun and the bullets and everything were in his possession in his bag with his pay stub. I don't know. I guess you all are going to have to speculate on that. And I don't think a verdict can be based on speculation, good or bad, as it applies to Mr. Braddy. And, again, also, it can never be based, I believe, and I would urge you to find, on an assumption.

(Ex. C at 399–401).

Case No.: 4:17cv478/RH/EMT

A review of closing argument shows that defense counsel was implying that the duffel bag was not found in Petitioner's bedroom, but in another one.  Therefore, the prosecutor's response in her rebuttal—that "[T]here was zero testimony on either the defense's side or the State's side about whose bedroom in that home was whose. Nobody said that where the gun was found with that wallet was not Mr. Braddy's room.  It very well could have been" (Ex. C at 424)—is more a fair comment on the evidence, or lack thereof, than a comment on Petitioner's silence.[5]  "It is not burden shifting for the state to comment on the lack of evidence supporting a defense theory where the defendant puts on a case and argues that a third person committed the crime."  *Williams v. State*, 225 So. 3d 349, 355 (Fla. 3d DCA 2017).  During cross-examination of a defendant, or during arguments to the jury, the prosecutor "may not make comments that would shift the burden of proof to the defendant." *United*

---

[5] At the evidentiary hearing, trial counsel was asked about this issue as follows:

Q. [Mr. Evans]: Now, in this case, the—they also raised an issue about whether or not you should have objected to some comments that they argue that was a comment on the Defendant's right to remain silent.

A. [Mr. Srygley]: Right.  Okay.  I mean, it's pretty much the—the same response. There's an old saying that hindsight is 20/20.  And so, certainly, just like you asked earlier, would you have asked—do you always ask as many questions as you can? You know, looking back, and I don't know any specifics I'm referring to, but there's always something you would want to do differently.

(Ex. N at 66–67).  Trial counsel was not asked specifically about the prosecutor's comment that no evidence was presented to the jury about which bedroom in the apartment was Petitioner's.

*States v. Bernal-Benitez*, 594 F. 3d 1303, 1315 (11th Cir. 2010).   Burden-shifting comments are those that "suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d at 1086.  However, a prosecutor may point out to the jury that there is an absence of evidence on a certain issue. *See White v. State*, 377 So. 2d 1149 (Fla. 1980). Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.

The state court found that the prosecutor's comments could reasonably have been seen by trial counsel as a fair comment on the evidence and the arguments made by the defense.  In addition, the circuit court found that even if defense counsel should have objected to this comment, this failure did not warrant a new trial under *Strickland*.   "Where counsel failed to raise a contemporaneous objection when improper closing argument comments were made, the unobjected-to comments must rise to the level of fundamental error, which has been defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Evans v. State*, 177 So. 3d 1219, 1234 (Fla. 2015) (quotation omitted).  Petitioner has failed to demonstrate that but for this alleged error, the outcome of his trial would have been different. Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable

application of *Strickland*, and was not based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this ground.

> Ground One, Sub-claim Three: Ineffective Assistance of Counsel For Failing to Object to Improper Closing Arguments—Cumulative Effect

In his reply, Petitioner alleges that the cumulative effect of the prosecutor's improper arguments "rose to a sufficient level of impropriety to entitle him to relief," and his counsel's failure to object to these arguments constituted ineffective assistance of counsel (ECF No. 18 at 24). In his amended 3.850 motion, Petitioner stated in his conclusion that "[w]hile each ground has merit on its own, taking counsel's deficient performance cumulatively further leads to the inescapable conclusion that both prongs of *Strickland* have been satisfied" (Ex. N at 20). In its order denying post-conviction relief, the court stated that "even considering the totality of all of the Defendant's arguments, the Court is not convinced that the Defendant was denied effective assistance of counsel" (Ex. N at 36).

1. Clearly Established Federal Law

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated: "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim." *Forrest v. Fla. Dep't of Corr.*, 342 F. App'x 560, 564

(11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority).

The *Forrest* panel further noted "[h]owever, the Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" *Id*. at 564–65 (quoting *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984)).  In light of *Cronic* and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law.  *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); *Schriro v. Landrigan*, 550 U.S. 465, 478 (2007) (the Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this"); *Reese v. Sec'y, Fla. Dep't of Corr*., 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law."); *see also Morris v. Sec'y,*

*Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012) (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

Furthermore, the Eleventh Circuit has rejected similar "cumulative error" claims asserted in federal habeas actions. *See, e.g., Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273 (11th Cir. 2014). The court in *Insignares* explained:

> Insignares claims cumulative error deprived him of a fair trial. Under the cumulative-error doctrine, a sufficient agglomeration of otherwise harmless or nonreversible errors can warrant reversal if their aggregate effect is to deprive the defendant of a fair trial. *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). "This court has made clear that where '[t]here [is] no error in any of the [trial] court's rulings, the argument that cumulative trial error requires that this Court reverse [the defendant's] convictions is without merit.'" *Id.* (quoting *United States v. Taylor*, 417 F.3d 1176, 1182 (11th Cir. 2005) (per curiam)) (alterations in original). Because we have found no error in the issues on appeal, Insignares has failed to show that the state judge lacked a reasonable basis to deny his cumulative-error claim.

*Id.* at 1284; *Morris*, 677 F.3d at 1132 ("Plainly, Morris's cumulative error claim must fail. As demonstrated above, none of Morris's individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

    2.    Federal Review of State Court Decision

Even assuming, without deciding, that Petitioner's "cumulative effect" claim is cognizable on federal habeas review, the claim provides no basis for federal habeas relief. Arguably, Petitioner raised his "cumulative effect" claim in his amended Rule 3.850 motion. The First DCA summarily affirmed the denial of this claim. Because neither the First DCA nor this court has found any error at all in the issues raised by Petitioner, applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to or an unreasonable application of federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

> Ground Two: Ineffective Assistance of Counsel For Failing to Sufficiently Reveal Inconsistencies in the Victim's Version of Events and to Otherwise Sufficiently Impeach the Victim's Credibility

In Ground Two Petitioner alleges that his counsel was ineffective for failing to impeach the victim with numerous inconsistent statements during his testimony and that the state court unreasonably applied *Strickland* in denying this ineffective assistance of counsel claim (ECF No. 18 at 25).

1.  Clearly Established Federal Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

2.  Federal Review of State Court Decision

Petitioner raised this claim in Ground Three of his amended Rule 3.850 motion. The post-conviction court denied relief, and the First DCA per curiam affirmed the

denial without opinion. The state circuit court adjudicated the claim as follows:

> Ground 3 of Defendant's motion alleges Mr. Srygley failed to impeach witnesses with prior inconsistent statements. The Court has carefully reviewed the statements which Defendant claims to be inconsistent. Any ineffective assistance of counsel by failing to impeach, if indeed such failure was ineffective, does not rise to the level under *Strickland v. Washington*, 466 U.S. 668 (1984) to raise a reasonable probability that the outcome of the case would have been different but for the failure to impeach. Failure to impeach as alleged by the Defendant would not undermine confidence in the jury's decision.

(Ex. N at 35).

The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id*.). Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence. Respondent argues that the state court determination was correct and that the record supports the determination.

In his reply, Petitioner elaborates on the inconsistencies about which he complains. First, he points out that the victim made statements to police immediately after the shooting that Petitioner appeared drunk during their interaction on the night in question (ECF No 18 at 25–26). However, at trial, the victim testified that Petitioner did not appear to be drunk at the time but "jittery." Petitioner argues that this description implied that Petitioner was nervous because he planned to pull a gun on

Mr. Cuavers.

At trial Mr. Cuavers testified that on the night of the shooting on the way home from his shift as a cook at Applebee's he contacted Petitioner to buy some marijuana. Mr. Cuavers testified that Petitioner told him that he was at a club, Baja's, and could not meet him at his home because "[h]e said he was too fucked up to drive" (Ex. C at 43). They decided to meet at Casa Cordoba, and Mr. Cuavers arrived around 2:45 a.m. The testimony continued as follows:

> Q. [Ms. Frazier]: And did it—you said earlier he had told you that he was too messed up to drive?
> A. [Mr. Cuavers]: Uh-huh.
> Q. Did he seem like he was intoxicated?
> A. Not—no, no.
> Q. Did he—was he acting any different than he normally would?
> A. He was acting real like jittery-ish, but not drunk.
> Q. Did he normally act in that jittery way?
> A. No.

(Ex. C at 43, 45). In his amended Rule 3.850 motion, Petitioner attached the incident report taken by Sergeant Kevin Taylor who interviewed Mr. Cuavers at approximately 3:42 a.m. The incident report states that Mr. Cuavers "said that 'Colt' [Petitioner] was drunk and had just come from partying at Baja's (a bar located at 2020 West Pensacola St)" (Ex. N, Exhibit A at 24). Sergeant Taylor was called as a trial witness and testified that when he arrived at the scene (the car which had picked Mr. Cuavers up on the roadside), Mr. Cauvers was in the backseat and was bleeding. Sergeant Taylor

continued, "[h]e was pretty well upset.  I mean it was pretty obvious that he was—he

was excited.  He was scared" (Ex. C at 104).  Sergeant Taylor continued, "I had a real

hard time initially just because I was trying to get him to calm down.  I mean, he

was—he kept asking over and over again if he was going to die.  I mean, he was pretty

scared (*id.* at 105).  Once he calmed down some, Sergeant Taylor testified that "[Mr.

Cuavers] then told me that he met with Colt, that Colt was drunk, appeared to be

drunk, and had allegedly just come from a nightclub called Baja's" (*id.*).

In cross-examining Mr. Cuavers, trial counsel touched on this point as follows:

> Q. [Mr. Srygley]: Okay.  You said that Mr. Braddy told you when you
> called him, contacted him, to quote you, he was too—and I won't use the
> term.  But I understand he was too—I'll just use the first letter—F'd up,
> okay, to come to where you were; is that right?
> A. [Mr. Cuavers]: Correct.
> Q.  You said later on, on prompting, you said he was a little jittery; is that
> right?
> A. Yeah, he wasn't really acting like himself.
> Q.  Okay.  And so you knew him well enough to know how he would
> normally be; is that right?
> A.  I would say so, yeah.  I met up with him and he was acting different.

(Ex. C at 78).  Mr. Cuavers also testified on direct examination that he and Petitioner

had a "business" relationship, explaining "[w]e weren't friends, but I didn't feel like

we were enemies" (Ex. C at 41).  On cross-examination, defense counsel questioned

Mr. Cuavers as follows:

> Q. [Mr. Srygley]: Okay.  Now, in your past dealings with Mr. Braddy, up

until this night, did you ever have any arguments with him?

A. [Mr. Cuavers]: No.

Q. Any problems with him?

A. Uh-uh.

Q. Were you having any dispute that night?

A. No.

Q. Other than, apparently, there wasn't enough marijuana so he went to get more?

A. We didn't have an argument about that either.

Q. Right. I mean, there wasn't even an argument. He just went to get more marijuana. I assume it is like going to the store—

A. Right.

Q. —and you buy one carton of milk and the grocer says, well, wait a minute, I know you need two. So they go get another carton of milk. Is it kind of like that; right? No animosity or problems; right?

A. No.

Q. Were you mad at him about anything?

A. Uh-uh, no.

Q. So this was just a simple, friendly business deal, is one way to put it, I guess?

A. You can, I guess.

(Ex. C at 68–69).

At the evidentiary hearing, the State questioned trial counsel as follows:

Q. [Mr. Evans]: Have you ever had a trial where you asked everything you could ask on cross examination?

A. [Mr. Srygley]: Well, no, I don't think you ever ask everything that you possibly could ever ask, because there are no absolutes. But in my experience over, over 30 years, would be that you try to hammer out the inconsistencies or the—more importantly the points you're trying to make from an adverse witness, in this case, Mr. Cuavers, and then at some point you want to get those points made. You want to finish, and you want to sit down, because at some point, in my experience—and I have actually talked to jurors after the fact—who may have approached

me in a Walmart and say, you know, "I appreciate you," you know, "we saw you at the trial. I enjoyed the trial," blah, blah, blah. "I don't know why you asked so many questions of that witness. We didn't believe him in the first place." Or, "I don't know why the State kept asking the same questions over and over again."

And at some point that gets hammered in, that jurors can get tired of listening to you as opposed to—and witnesses. They want to hear what's going on, but it's really subjective what you ask and what you don't. You try to hit as many things as you can, whether it be inconsistencies or testimony that's favorable to your client's position. And, of course, sometimes you don't know what a witness is going to say, so you've got to be careful. If you don't really anticipate and know what a witness is going to say, you don't want to ask that question, because it can, in fact, hurt you.

Q. Okay.

A. So it's all a matter of art and strategy and hoping to get your points across the best as you possibly can by asking the questions that you want to ask to the best of your ability. And then the jury, in their wisdom, I guess, in the—as they go back to decide, they decide what they think was important and what questions were asked or weren't asked or the answers and that sort of thing, of all of the witnesses.

Q. Okay. Now, what did you want to draw out from the victim in this case about his testimony?

A. Well, number one, he—he was—if I remember the facts correctly, the fact that he, himself, was intoxicated either by drugs or alcohol while this was happening; so, therefore, his memory of what happened specifically was clouded that night. Number two, that he was there that night to purchase drugs, which is illegal.

He testified or had made statements in deposition, as well as I think in the police reports that he routinely bought drugs, so he was not just a first-time-buyer; that—that he—what he was saying was diametrically

opposed to what our position was as far as how it all happened.  And then, I guess, counting up here, the fifth thing would be that Mr. Cuavers was—did not see who shot him.  He did not ever see a gun being fired.  He only heard the report or the noise from a gun.

He—I'm trying to remember the rest of it, and not so much from Mr. Cuavers; but, in fact, we made an argument, I mean, if Mr. Cuavers was correct that Mr.—you  know, he believed or he thought or he suspected or whatever the word would be, the right verb, that Mr. Braddy had been the one firing the gun, there was no evidence in the car to substantiate that.  There was no gunshot residue.  There was nothing.  And the—there was no broken window.  There was nothing circumstantially which would show that Mr. Braddy had been the one to fire a weapon as opposed to the other person who is—again, evidence was found later to substantiate was Mr. Johnson or someone else, not Mr. Braddy.

* * *

Q.  So did you feel you were able to get out the point that you wanted to get out, that the victim had been on drugs at the time?  And you also pointed out the fact that at the time he made the identification in this case that he was on—he was on morphine or something at the hospital; is that correct?

A. That's true, I remember that.  Obviously, he had been—he was being questioned after being treated for a gunshot wound.  He was on painkillers and in shock and everything else, so I was trying to basically—well, I think you picked it up—obviously show that he was not a credible witness for all these different reasons.

(Ex. N at 59–62).

Again, the defense strategy was that Petitioner was not the shooter.  Therefore, defense counsel may have decided that to emphasize Petitioner's demeanor that night was not in the defense's best interest.  Defense counsel made the primary point that

Petitioner did not have a motive to shoot the victim and that not even the victim could testify that there was any animosity between the two.  Petitioner has not demonstrated that this strategy was unreasonable given the evidence in the case.  Petitioner has also failed to demonstrate that but for his counsel's failure to raise the inconsistency in the victim's statements about Petitioner's demeanor, the outcome of the trial would have been different.  The state court found that even if the failure to raise this inconsistency was deficient performance, Petitioner had not demonstrated prejudice under *Strickland*.  Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this issue.

Second, Petitioner alleges that at trial Mr. Cuavers testified that he contacted Petitioner on his way home from work on the night of the shooting, but in his pretrial deposition he said he was texting Petitioner while he was still at work (ECF No. 18 at 26). At trial the following testimony addressed when Mr. Cuavers contacted Petitioner:

> Q. [Ms. Frazier]: Now, while you were at work that evening, did you have any communication with Mr. Braddy?
> A. [Mr. Cuavers]: I don't remember.
> Q. Okay.  At some point in the evening did you?
> A. On the way home—on the way home I contacted him and he told me—

(Ex. C at 42).  Mr. Cuavers was deposed on December 22, 2011.  In describing the events of the evening of the shooting, Mr. Cuavers testified that when he got home from his shift at Applebee's around 2:30 a.m., he ate a sandwich "and then I called the defendant to purchase some marijuana" (Ex. A at 61).  Later on in the deposition, this point was touched on again as follows:

> Q.  [Mr. Srygley]:  Okay.  All right. Well, let's go back.  So you called him on the phone, what happened next that night?
> A.  [Mr. Cuavers]: It was like while during work, while I was working, you know, we texted, and "do you have any" and he's like, yeah, he does—like he always did—and it was just when I got off call him and we would meet.
> Q.  All right.  So you began this communication you text him; I mean, you text him and say, "Do you have any et cetera?"
> A.  That night?
> Q.  Uh-huh, that particular night.
> A.  I couldn't tell you if I texted him first, but he would randomly text me: "Yo, are you all right?" Because he knows that I smoke.  So he would text me and I would text him.  But that night I couldn't tell you if I had texted him first or—
> Q.  But you said you had called him?
> A.  Yeah.   Where are we talking about?  At work or the apartment?
> Q.  We've talked about work.  Let's talk about the apartment.
> A.  Okay, we go to the apartment.
> Q.  3:00?
> A.  3:00.  He says he's leaving the Club Baja, it's on Pensacola Street, which I live on Pensacola Street, all right?  So he could have come right there.  He was saying how fucked up he was; these are the words he's using: I'm too fucked up to drive.  That's what he say.  Meet me at his girlfriend's house, a place that I had never been and I said okay.  And this place was Casa Cordoba on Ocala Street.

(Ex. A at 62–63).

Case No.: 4:17cv478/RH/EMT

Petitioner has not demonstrated how this minor inconsistency is relevant to any material issue at trial or how this inconsistency would adversely affect Mr. Cuavers's credibility. Therefore, he has failed to demonstrate that his counsel's failure to point out this inconsistency during the cross-examination of Mr. Cuavers rises to the level of deficient performance. The record demonstrates that trial counsel attempted to discredit Mr. Cuavers's testimony in several ways. Most importantly, he got Mr. Cuavers to admit that he did not see Petitioner exit the car or shoot at him. Counsel also got Mr. Cuavers to admit that he and Petitioner, who regularly sold him drugs, did not have any animosity and Petitioner did not have any reason to shoot him. He also questioned whether Mr. Cuavers was under the influence of morphine on the night he was shot when he was questioned by law enforcement. Finally, defense counsel re-emphasized the point that Mr. Cuavers was a convicted felon after the State briefly touched on the conviction during his direct examination. These factors, considered alongside defense counsel's general strategy regarding the cross-examination of witnesses (which he explained during his post-conviction evidentiary hearing testimony), refute Petitioner's ineffective assistance of counsel claim under either prong of *Strickland*, as the state court found. Thus, applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not

based on an unreasonable determination of the facts. Therefore, Petitioner is not entitled to habeas relief on this issue.

> Ground Three: Ineffective Assistance of Counsel For Failing to Object to the Trial Court's Deficient Instructions to the Jury on the Applicable Lesser-Included Offenses

In his final ground Petitioner alleges that his trial counsel was deficient in waiving a jury instruction that included all applicable lesser-included offenses, including attempted voluntary manslaughter which is a necessary included offense to the charged offense (ECF No. 18 at 28–31). Because the instruction was not given, Petitioner argues that he was forced to waive the issue on appeal.

1. Clearly Established Federal Law

The law governing claims of ineffective assistance of counsel is set forth *supra*.

2. Federal Review of State Court Decision

Petitioner raised this claim in Ground One of his amended Rule 3.850 motion. The post-conviction court denied relief, and the First DCA per curiam affirmed the denial without opinion. The state circuit court adjudicated the claim as follows:

> Ground 1 alleges that trial counsel, Paul D. Srygley, provided ineffective assistance of counsel by failing to request a jury instruction on the lesser included offense of Attempted Voluntary Manslaughter. The Defendant argues that Ground 1 should not be considered a matter of trial strategy, but given the facts of this case, it is hard to envision why attempted voluntary manslaughter would be an appropriate instruction. Ground 1 is a classic example of trial strategy.

Case No.: 4:17cv478/RH/EMT

> Moreover, the defendant in this case was convicted of attempted first-degree murder [sic], a higher offense than the lesser included offense of attempted voluntary manslaughter. The jury, fulfilling its obligations under the jury instructions found that the State had proven beyond a reasonable doubt all the elements necessary for a conviction of attempted first-degree murder. Having made such a finding, in compliance with the jury instructions, the jury never would have considered the lesser included offense of attempted voluntary manslaughter. Therefore, any decision by trial counsel that could be considered deficit was made moot by the jury's actions.

(Ex. N at 34).[6]

The post-conviction court correctly identified *Strickland* as the federal law governing this claim (*see id.* at 35). Therefore, Petitioner is entitled to relief only if the state court's adjudication of this claim was contrary to or an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts in light of the evidence. Respondent argues that the state court determination was correct and that the record supports the determination.

The record reflects that defense counsel informed the court that Petitioner wanted the lesser included offenses be charged to the jury, and Petitioner acknowledged this in open court (*see* Ex. C at 345). The lesser included charges were

---

[6] Petitioner was convicted of attempted second-degree murder. Post-conviction counsel appeared to concede in his initial brief on appeal from the denial of post-conviction relief that the court intended to state that Petitioner was convicted on attempted second-degree murder (*see* Ex. O at 28).

Case No.: 4:17cv478/RH/EMT

not defined by defense counsel in questioning Petitioner about this issue.  At trial, the

lesser included offenses read to the jury were attempted second-degree murder,

aggravated battery, and battery (Ex. C at 357–61).  Defense counsel did not object to

the reading of the instructions (Ex. C at 370).   Petitioner argues that attempted

voluntary manslaughter did not carry the potential for a 10/20/life enhancement so the

court would not have been required to sentence him to a minimum term of 20 years.

At the evidentiary hearing, defense counsel testified about this issue as follows:

Q. [Mr. Evans]: Okay.  Now, in this case, was—and was it ever your or
the defense request to try to argue this case for a lesser-included offense?

A. [Mr. Srygley]: That's something that was discussed with Mr. Braddy
and with his parents who were very attentive and were here to kind of
help him, I guess, give him advice on what they thought he might do.  He
was a relatively young man, and I appreciated the fact that his parents
were very involved with the case and very supportive of him and of me
in trying the case.  And—but one of the issues was: Do you want to do
an all-or-nothing type presentation as far as jury instructions?  In other
words, either you didn't do it at all; or if you did do something, it was
something lesser.  And so that was something that was discussed, and it
was determined that he did want some lesser counts.

The concern that I had and that I believe was, if I remember correctly,
evidenced by his parents as well as Mr. Braddy is that the jury not be
given too much to find as far as a violent lesser offense because we really
felt like we were making a good argument, we were making a good case,
and we wanted to give the jury every possible opportunity to find him
guilty of—if at all—we were trying to make it very clear, we felt he
should be found not guilty.  We don't think the State proved the case,
period.  But if there was any chance whatsoever that he might be found
guilty of something, we hoped it would be something very minor and not

something that could enter attempted first degree murder. And, of course, the jury did come back with a lesser of attempted second-degree murder.

Q. Okay. But I guess my point goes back to while you may have been hoping that they may have chosen something lesser than first—

A. Right.

Q. —then the argument was not that he was guilty of some lesser-included offense but that he was, in fact, not guilty?

A. Correct. That we never in any shape or form try to argue or present a case or anything of that sort that he was guilty of anything. He was actually the victim of a robbery, not only prior to the incident that was tried; but he—Mr. Cuavers had stolen his gun, in fact two guns, if I remember correctly, and that this whole episode came about because Mr. Cuavers wanted to basically sell back the gun that he had stolen to Mr. Braddy for either money or marijuana. And that was our whole argument, that—and we, you know, that was the gist of it. And the answer is we were trying to show and I believe we did show that he was not guilty, period.

The jury found him guilty, unfortunately, of a lesser offense but not of the original charge that was tried before the jury of attempted first-degree murder.

(Ex. N at 56–58).

Respondent argues that the State was correct when it argued at the post-conviction evidentiary hearing that the issue of lesser included offenses is controlled by *Sanders v. State*, 946 So. 2d 953 (Fla. 2006), which held as a matter of law that failing to request a lesser included offense could not rise to the level of prejudice in a

collateral proceeding because the jury necessarily found all of the evidence needed to convict of the greater offense (ECF No. 12 at 65–69).  Under Florida law, a jury is permitted to convict of a lesser included offense "only if it decides that the main accusation has not been proved beyond a reasonable doubt." *Sanders*, 946 So. 2d at 958 (internal quotation marks omitted). *Strickland* requires that the court assume that the jury in Petitioner's trial followed this rule of law.  466 U.S. at 694 ("[A] court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law.  An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of . . . 'nullification[.]'").  In addition, "[w]hen a jury convicts a defendant of a criminal offense, it has decided that the evidence demonstrated beyond a reasonable doubt that the defendant committed the crime charged.  To assume that, given the choice, the jury would now acquit the defendant of the same crime of which it convicted him, and instead convict of a lesser offense, is to assume that the jury would disregard its oath and the trial court's instructions." *Sanders*, 946 So. 2d at 958.

The jury in Petitioner's trial concluded that the evidence against him supported his conviction for attempted second-degree murder which is a lesser offense than the one charged, attempted first-degree murder.  The jury also rejected the other lesser included offenses on which it was instructed, *i.e.*, aggravated battery and battery.

Therefore, even if the lesser offense instruction on attempted voluntary manslaughter had been given, the jury would not have been permitted to convict Petitioner of any lesser included offense because the jury had concluded that the evidence established that Petitioner was guilty of the greater offense. *See Sanders*, 946 So. 2d at 958. Further, it is pure speculation to assert in this case that there is a reasonable probability the jury would have ignored its own findings of fact and the trial court's instructions on the law, and found Petitioner guilty of any of the lesser included offenses he identifies.

Petitioner has not demonstrated that the First DCA unreasonably applied *Strickland* in concluding that defense counsel's failure to request jury instructions on the lesser included offense of attempted voluntary manslaughter did not prejudice Petitioner's defense. *See Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x. 888, 888–89 (11th Cir. 2012) (unpublished but recognized for persuasive authority) ("The jury in Santiago's trial concluded that the evidence against him supported his conviction for the greater offenses on which it was instructed; therefore, even if the lesser-offense instructions had been given, the jury would not have been permitted to convict Santiago of the lesser included offenses because it had concluded that the evidence established that he was guilty of the greater offenses. . . . Accordingly, we cannot say that the Florida appellate court unreasonably applied *Strickland* in

Case No.: 4:17cv478/RH/EMT

concluding that Santiago's counsel's failure to request the lesser included offense instructions did not prejudice his defense") (citing *Sanders*, 946 So. 2d at 958); *Magnotti v. Sec'y for Dep't of Corr.*, 222 F. App'x. 934, 940 (11th Cir. 2007) (unpublished); *Harris v. Crosby*, 151 F. App'x. 736, 738 (11th Cir. 2005) (unpublished).  Here, the jury found beyond a reasonable doubt that the evidence established every element of attempted second-degree murder.  The undersigned cannot now find that the same jury would have ignored its own findings of fact, disregarded the circuit court's instruction on the law, and found Petitioner guilty of attempted voluntary manslaughter instead.

Petitioner has  failed to demonstrate deficient performance or prejudice under *Strickland*.  Applying *Wilson*'s "look-through" presumption, the First DCA's rejection of Petitioner's claim was not contrary to *Strickland*, did not involve an unreasonable application of *Strickland*, and was not based on an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to habeas relief on this ground.

IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing

required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327). Here, Petitioner cannot make that showing. Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

It is hereby **ORDERED**:

The clerk of court is directed to substitute Mark S. Inch for Julie Jones as Respondent.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 11<u>th</u> day of April 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**